Scott A. George
Jonathan Shub *(Pro Hac Vice Appl. To Be Filed)*
Seeger Weiss LLP
550 Broad Street; Suite 920
Newark, NJ 07102
973-639-9100 tel
973-639-9393 fax
Email:      jshub@seegerweiss.com
            sgeorge@seegerweiss.com


Attorneys for Plaintiffs and the proposed classes

[Additional counsel listed on signature page]

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| Jason Popejoy, Joe Sawyer, and Daniel Sullivan on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>Sharp Electronics Corporation,<br><br>Defendant. | CASE NO. _____<br><br><br>**CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

Jason Popejoy, Joe Sawyer, and Daniel Sullivan (collectively, "Plaintiffs"), by and through Plaintiffs' undersigned attorneys, on behalf of themselves as well as the proposed classes (defined *infra*), demanding trial by jury of all claims properly triable thereby, makes the following allegations and claims against Sharp Electronics Corporation ("Sharp" or "Defendant").

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, fees, and costs and at least one Class member is a citizen of a state different from Defendant.

2.      Defendant Sharp Electronics Corporation is a New York corporation with its principal place of business located in Mahwah, New Jersey.  Sharp transacts business in New Jersey, advertises and markets its products in New Jersey, disseminates representations and deceptions throughout New Jersey, and derives substantial income from the sale of products in New Jersey.

3.      Pursuant to 28 U.S.C. § 1391, venue is proper in this Court because a substantial part of the events, omissions and acts giving rise to the claims herein occurred in this District.

4.      Additionally, venue is appropriate for the claims arising out of New Jersey's Consumer Fraud Act because the statute applies to any company engaging in any of the activities regulated by the Act within the State of New Jersey.

## PRELIMINARY STATEMENT

5.      This action is brought by Plaintiffs, on behalf of Plaintiffs and the proposed classes described herein, to recover damages and restitution in connection with the purchase of Sharp-brand televisions that were falsely marketed and advertised by Sharp as "LED TVs," "LED HDTVs" or "LED televisions."  Plaintiffs and the proposed classes also seek an injunction: (a) requiring Sharp to engage in a corrective advertising campaign to alert consumers

nationwide (or, alternatively, in California, North Carolina, and Massachusetts) as to the true nature of these televisions; (b) prohibiting Sharp from continuing falsely to market and advertise such televisions nationwide (or, alternatively, in California, North Carolina, and Massachusetts) as "LED TVs," "LED HDTVs," or "LED televisions"; and (c) requiring Sharp to recall and re-label all such televisions that have already been distributed nationwide (or, alternatively, in California, North Carolina, and Massachusetts) for re-sale in that State, but not yet sold to retail customers.

6.       The televisions at issue are not "LED TVs," but instead are **LCD** TVs that use light emitting diodes (LEDs) instead of cold cathode fluorescent lights (CCFLs) as a light source to illuminate the liquid crystal display (LCD) panel on which the picture is displayed in each of the televisions at issue.

7.       Sharp's failure to disclose that its references to LED refer to the light source that illuminates the LCD panel, **instead of the display technology itself,** and its nondisclosure and concealment that each of the televisions is otherwise functionally identical to televisions that are advertised and sold as "LCD TVs," were at all times knowing, intentional, and intended to mislead consumers.  Sharp's false and misleading marketing and advertising were and are designed falsely to suggest that the televisions at issue are not LCD TVs at all, but an entirely different, improved, and technologically advanced class or species of television.  This is false; all of these televisions are LCD TVs.

8.       Without limitation, Sharp has used and continues to use this deception: (a) to induce customers to purchase Sharp's so-called LED TVs in the mistaken belief that they are upgrading from their existing CCFL-lit LCD TVs; (b) to charge a premium for such televisions that Plaintiffs and other consumers would not have paid had the televisions been accurately labeled and described; and (c) to capture sales from other brand televisions that were accurately labeled as LED-lit LCD TVs.

9.       Sharp has perpetrated a massive consumer fraud upon hundreds of thousands of unsuspecting purchasers, each of whom paid an unsupported premium for a deceptively labeled

"LED TV," and on whose behalf Plaintiffs bring this action to recover such premium and for other appropriate relief.

## PARTIES

10.     Plaintiff Jason Popejoy is a citizen of California, and purchased a Sharp-brand television (model number (or prefix) LC60LE550U) for personal use and not for resale.  When Popejoy was considering purchasing this television, there were three flat panel television options widely advertised in the market at large – "Plasma TVs," "LCD TVs" and "LED TVs."  Popejoy considered one or more of these options prior to purchasing a television.  Popejoy selected Sharp's "LED TV" model because of Sharp's marketing assertions on the carton containing the television that it was an "LED TV."

11.     Plaintiff Joe Sawyer is a citizen of North Carolina, and purchased two Sharp-brand televisions (model numbers (or prefixes) LC70LE632 and LC80LE857) for personal use and not for resale.  When Sawyer was considering purchasing these televisions, there were three flat panel television options widely advertised in the market at large – "Plasma TVs," "LCD TVs" and "LED TVs."  Sawyer considered one or more of these options prior to purchasing the televisions.  Sawyer selected Sharp's "LED TV" models because of Sharp's marketing assertions on the cartons containing the televisions that each was an "LED TV."

12.     Plaintiff Daniel Sullivan is a citizen of Massachusetts, and purchased a Sharp-brand television (model number (or prefix) LC42LB150U) for personal use and not for resale. When Sullivan was considering purchasing this television, there were three flat panel television options widely advertised in the market at large - "Plasma TVs," "LCD TVs" and "LED TVs." Sullivan considered one or more of these options prior to purchasing a television.  Sullivan selected Sharp's "LED TV" model because of Sharp's marketing assertions on the carton containing the television that it was an "LED TV."

13.     Sharp is a New York corporation with its principal place of business located in Mahwah, New Jersey.  Upon information and belief, Sharp's deceptive marketing and

advertising campaign originated out of its principal place of business in New Jersey.  Sharp distributes and markets and directs the marketing of so called "LED TVs" within this district, the State of California, the State of North Carolina, the State of Massachusetts, and throughout the United States.

**STATEMENT OF FACTS**

**TELEVISION OWNERSHIP AND SALES STATISTICS**

14.     Televisions are ubiquitous in our society.  The Nielsen Company, a world-renowned expert in the field of television viewership, reported in 2012 that 97.1% of all U.S. households owned a television, and 84.4% owned more than one.  According to the same report, in 2012, U.S. households were more likely to own a television than a cell phone (87.3%), DVD player (86.7%), or personal computer (80.9%).

15.     While the TV household penetration rate in the U.S. has been high for decades – exceeding 90% since 1965 – rapid advances in display technology (including the introduction of so-called flat panel televisions), the dramatic expansion of non-broadcast "cable" and "satellite" channels and providers, price competition, and the Congressional mandate that all full power television broadcasters (like ABC, NBC, and CBS) broadcast exclusively in digital format starting on June 13, 2009, have led many, and perhaps most, U.S. households to purchase at least one television, and often several units, within the past few years alone.

16.     Industry statistics bear out this phenomenon.  In February 2008, 25.1% of all U.S. households were HD Display Capable – meaning that they were "equipped with an HD television that [was] capable of displaying HD content."  (HD or high definition content refers to the resolution of the screen image.  HDTVs produce a resolution or level of detail that is much greater than standard definition televisions.)  By May 2012, however, the number of U.S. households that were HD Display Capable had increased to 75.5%.  Non-HD televisions cannot be converted into HD televisions.  In order for the penetration rate to have tripled, 50% of all

U.S. households (or approximately 57,000,000 households based on U.S. Bureau of Statistics figures) had to buy at least one new television unit in that approximately 4-year period.

17.    Industry statistics show:

a)    In 2009, television manufacturers shipped over 35,300,000 "flat panel" (Plasma or LCD) television units for sale in the United States.

b)    In 2010, television manufacturers shipped over 38,600,000 "flat panel" (Plasma or LCD) television units for sale in the United States.

c)    In 2011, television manufacturers shipped almost 40,000,000 "flat panel" (Plasma or LCD) television units for sale in the United States.

d)    In 2012, television manufacturers shipped over 37,600,000 "flat panel" (Plasma or LCD) television units for sale in the United States. Total revenue from 2012 sales exceeded $28 billion.

e)    While final figures were not yet accessible as of filing, in 2013, television manufacturers were forecast to ship over 36,600,000 "flat panel" (Plasma or LCD) television units for sale in the United States.  Total revenue from 2013 sales was projected to exceed $28 billion.

18.    As the following industry chart makes clear, globally, LCD TVs comprise the overwhelming majority of flat panel sales, and LED-lit LCD TVs now comprise the overwhelming majority of "LCD TV" sales:



19.     Although LED-lit LCD TVs were introduced to the mass market in or about 2008, this technology has quickly come to dominate U.S. LCD TV unit sales, as the following statistics demonstrate:

a)      In 2009, approximately 3% of all LCD TV units sold in the US (volume, not dollar value), used LED backlighting.

b)      In 2010, approximately 22% of all LCD TV units sold in the US (volume, not dollar value), used LED backlighting.

c)      In 2011, approximately 45% of all LCD TV units sold in the US (volume, not dollar value), used LED backlighting.

d)      In 2012, approximately 51% of all LCD TV units sold in the US (volume, not dollar value), used LED backlighting.

e)      In 2013, approximately 84% of all LCD TV units sold in the US (volume, not dollar value), were projected to use LED backlighting.

**SHARP'S MARKET SHARE**

20.     Sharp is a well-known electronics manufacturer and a significant player in the U.S. television market.  Sharp's market share in the U.S. LCD TV segment ranged from about 2.4% to about 4.7% between 2009 and 2012.

21.     The growth and maintenance of Sharp's market share of the U.S. market for LCD TVs is due, in part, to the false advertising described herein.

## TELEVISION DISPLAY TECHNOLOGIES

### CRT Televisions and Analog Rear Projection Televisions

22.     From virtually its earliest beginnings until the late 1990s, direct view CRT-technology (cathode ray tubes) dominated the United States television market.  These were the boxy televisions of old, and were sold to consumers in a variety of screen sizes, up to a maximum of 37" (measured diagonally).

23.     In a cathode ray tube television, a filament is placed inside a vacuum glass tube.  When the filament (cathode) is activated by electricity, it generates electrons, which fall off the heated filament into the vacuum.  A focusing anode attracts the electrons and focuses them into a tight beam or "ray," which is then accelerated.  The tight, now high-speed electrons travel through the vacuum in the tube and strike the flat glass screen at the other end of the tube – which is the back of the television's outward facing screen.  The back of the screen is coated with phosphor, which glows when struck by the electron beam.

24.     A phosphor is any material that, when exposed to radiation (like the electron beam), emits visible light.  In a black and white CRT TV, there is one phosphor that glows white when struck.  In a color screen, there are three phosphors arranged as dots or stripes, so as to emit red, green, and blue light when struck by the ray.

25.     CRT TVs were for decades the only televisions consumers could purchase.

26.     Exemplar images of CRT televisions follow:

  

27.     CRT TVs, moreover, have a built in size limitation.  The size of the screen is proportional to the size of the vacuum tube.  To increase the screen size, one must increase the length of the vacuum tube.  As a result, CRT TVs for the consumer market were generally only available in sizes up to 37" diagonal.

28.     Consumers who wanted a larger screen image were forced to purchase analog projection televisions.  Analog projection televisions of this era also used vacuum tube technology to generate the screen image.

29.     Exemplar images of analog projection televisions follow:

 

Plasma Televisions

30.     In or about the early 2000s, television manufacturers began introducing flat panel, plasma display televisions ("Plasma TVs") to the mainstream consumer market.  The introduction of Plasma TVs, which were thin and light enough to be mounted directly on a wall, revolutionized the television industry.

31.     Plasma TVs use plasma displays, which are composed of millions of small cells, or pixels, containing electrically charged ionized gases, to generate the screen image.  When the television is turned off, the ions and electrons in the gas or "plasma" are equally balanced, the atom is stable, and the pixel is dark.  When electricity is introduced, however, the atoms become

unstable and electrons and particles within the plasma begin to collide, releasing photons of ultraviolet energy.

32.     Each pixel within the plasma display is made up of three separate subpixel cells with different colored phosphors – one red, one blue, and one green.  As discussed above, in the context of CRT TVs, phosphors produce light photons – they glow – when struck by energy. The phosphors in the Plasma TVs are activated by the ultraviolet photons, which can be varied in number by pixel and subpixel.  The amount of electricity applied to the subpixel determines the number of ultraviolet photons generated, and thus the color intensity the subpixel generates, which combines with the primary colors generated by the other two subpixels to determine the color displayed on the screen by the pixel.  All of the pixels acting together generate the screen image.  Exemplar graphical depictions of the image generating process for a plasma display are set forth below:



33.     The pixels used in plasma displays do not require a separate light source; the image and all of the colors are generated by the interaction between the electrically charged ionized gases and the phosphor in the cells.



9

34.     A generic image of a Plasma TV is set forth below:



LCD Televisions

35.     In the early to mid-2000s, television manufacturers began introducing flat panel, liquid crystal display televisions ("LCD TVs") to compete with Plasma TVs (and to a lesser degree other available alternative technologies, e.g., CRT).  While flat, reasonably light, and wall-mountable like Plasma TVs, LCD TVs utilize a fundamentally different display technology – liquid crystal displays ("LCD").

36.     To form a liquid crystal display or LCD, a very thin layer of a liquid crystalline substance is sandwiched between two substrates, which are sheets of glass or plastic to which a grid of electrodes has been applied.  A vertical polarizing film is applied to the LCD's rear substrate.  Patterned red, green and blue color filters and a horizontal polarizing film are applied to the front substrate.  The liquid crystals are rod-shaped polymers that are neither solid nor liquid and, when subject to an electric current, will align in a predictable manner.  In an LCD TV, the liquid crystal display (or LCD) is then lit by a separate source of light (the "light source") because, unlike plasma displays, liquid crystals do not emit light themselves.

37.     An LCD TV generates screen images by controlling the amount of light from the light source that passes through the LCD and strikes the color filters.  In very simple terms, the LCD is comprised of millions of tiny liquid crystal "shutters" that allow or block the passage of light depending on the intensity of the electric current being applied.  Each of these liquid crystal "shutters" corresponds to a tiny rectangular red, green, or blue filter or sub-pixel that is mounted to the front substrate (the surface closest to the television's glass screen).  As with plasma displays, three sub-pixels – one red, one green, and one blue – comprise a single pixel, and a "Full HD" or high definition television will contain more than 2 million pixels (1920 pixels horizontally multiplied by 1080 pixels vertically).  The amount of light that passes through each liquid crystal "shutter" determines the intensity of the red, green, or blue color that the corresponding subpixel generates.  The interaction of the trio of subpixels (for each pixel) determines the color that is displayed on the screen for that pixel.  All of the pixels together generate the screen image.  Exemplar graphical depictions of the image generating process for a liquid crystal display are set forth below:





38.     LCD technology is light source neutral: *i.e*., **any** white light source can be used to light and thus generate the screen image, a fact that has been widely known throughout the manufacturing industry since the introduction of this technology.

39.     Initially, and for quite a number of years, all manufacturers of LCD TVs primarily used cold cathode fluorescent lights (CCFLs) as the source light.   A picture of a generic CCFL light source of the type used in LCD TVs follows:



40.     Television manufacturers, however, continued to experiment with and market LCD TVs with other light sources, including LEDs, throughout this period.  For example, in 2004, Sony introduced the Sony Qualia 005.  The Sony Qualia 005 used an array of light emitting diodes to illuminate the LCD panel.  The introduction of a different light source did **not** change the manner in which LCD panels and LCD TVs generate the screen image described above.  A picture of a generic LED light source of the type used in LED-lit LCD TVs follows:



41.     Soon after their introduction, LED-lit LCD TVs proliferated, with multiple manufacturers using light emitting diodes, instead of CCFLs, to the light the liquid crystal display.  Some of these devices place the LEDs behind the liquid crystal display (back- or direct-lit), while others place the LEDs on the edge of the liquid crystal display (edge lit).  But all of these televisions—regardless of the light source—employ a liquid crystal display of LCD screen to generate the TV picture.

42.     Sharp introduced its first LCD TV with an LED light source, Model LC-52XS1US, in approximately December 2008, and followed with additional models and generations of LED-lit LCD TVs in subsequent years.  Initially, LED-lit LCD TVs represented only a small fraction of Sharp's total LCD TV and other flat panel sales.  At the time of the filing of this complaint, all of the current model TVs listed on Sharp's U.S. website are LED-lit LCD TVs.

## MARKETING OF LCD TELEVISIONS

43.     When liquid crystal display televisions were first introduced into the market, the televisions were universally marketed as "LCD TVs," just as plasma display televisions had been advertised as Plasma TVs.  No effort was made to advertise or designate this product line in reference to the CCFL or other light source used to light the LCD panel.  For example, the Sony Qualia was not advertised as an LED TV, nor were comparable liquid crystal displays using CCFL backlights advertised as CCFL TVs.  This remained true even as LED-lit LCD TVs became cheaper to manufacture and more common in the consumer segment of the market.

44.     Sharp's initial LED-lit LCD TV units were similarly identified and advertised as LCD TVs, or sometimes as LED-backlit LCD TVs as the following press release, website, marketing materials, box images and manual demonstrate:

● Press release/article:

SHARP INTRODUCES AQUOS® LED

Breakthrough New Line of LED Backlit LCD TVs Bring Superior Brightness and Image Quality Combined with Industry's Lowest Power Consumption for True Value

NEW YORK, July 7, 2009 – Sharp Electronics unveils, for the first time worldwide, AQUOS LED, an LCD TV Series that provides the ultimate in picture quality and value, offering consumers the lowest power consumption of any available LCD TV. A new series of LCD TV's that combines Sharp's award-winning AQUOS LCD technology with a Full-Array LED backlight system, the new LE700 AQUOS LED Series delivers unprecedented image quality and energy-efficient, eco-friendly performance. This Full-HD 1080p LCD TV Series, available in 52- (LC-52LE700UN), 46- (LC-46LE700UN), 40- (LC-40LE700UN) and 32-inch (LC- 32LE700UN) screen class sizes (52 1/32", 45 63/64", 40", and 31 35/64" Diagonal respectively), introduces a newly-developed X-Gen Panel with advanced pixel control for extremely deep black levels.

The AQUOS LED series also includes Sharp's AQUOS Net™* capability, a service that gives users instant access to customized Web-based content as well as real-time customer support. "Sharp demonstrated the unlimited possibilities of LCD, bringing the first LED back-lit AQUOS LCD TV to market last year, and we continue to advance the category today," said Bob Scaglione, senior vice president and group manager, Product and Marketing Group, Sharp Electronics Corporation. "With the introduction of the AQUOS LED Series, we are bringing consumers an affordable display solution with superior picture and environmental performance that provides a true value. Sharp is able to deliver a price -competitive yet high-performance product by producing many of the key components of the TV, including the LED components and the LCD panel."

● Website and marketing materials:









- Box:





- Manual:

## Appendix

### Specifications

| Item | | | Model: LC-40LE700UN | Model: LC-46LE700UN | Model: LC-52LE77UN |
|---|---|---|---|---|---|
| LCD panel | | | 40" Class (40" Diagonal) Advanced Super View & BLACK TFT LCD | 46" Class (45 ¹⁵/₁₆" Diagonal) Advanced Super View & BLACK TFT LCD | 52" Class (52 ¹/₁₆" Diagonal) Advanced Super View & BLACK TFT LCD |
| Resolution | | | 2,073,600 pixels (1,920 × 1,080) | | |
| TV Function | TV-standard (CCIR) | | American TV Standard ATSC/NTSC System | | |
| | Receiving Channel | VHF/UHF | VHF 2-13ch, UHF 14-69ch | | |
| | | CATV | 1-135ch (non-scrambled channel only) | | |
| | | Digital Terrestrial Broadcast (8VSB) | 2-69ch | | |
| | | Digital cable¹ 64/256 QAM) | 1-135ch (non-scrambled channel only) | | |
| | Audio multiplex | | BTSC System | | |
| Backlight | | | 100,000 hours (at Backlight Standard position) | | |
| Audio out | | | 10W × 2 | | |
| Terminals | Rear | INPUT 1 | AV in, COMPONENT in | | |
| | | INPUT 2 | COMPONENT in, S-VIDEO in | | |
| | | INPUT 4 | ANALOG RGB (PC) in (15-pin mini D-sub female connector), Audio in (Ø 3.5 mm jack) | | |
| | | INPUT 6 | HDMI in with HDCP, Audio in (Ø 3.5 mm jack) | | |
| | | INPUT 7 | HDMI in with HDCP | | |
| | | INPUT 8 | HDMI in with HDCP | | |
| | | ANT/CABLE | 75 Ω Unbalances, F Type × 1 for Analog (VHF/UHF/CATV) and Digital (AIR/CABLE) | | |
| | | AUDIO | Audio in (Ø 3.5 mm jack) | | |
| | | DIGITAL AUDIO OUTPUT | Optical Digital audio output × 1 (PCM/Dolby Digital) | | |
| | | ETHERNET | Network connector | | |
| | | OUTPUT | Audio out | | |
| | | RS-232C | 9-pin D-sub male connector | | |
| | Side | INPUT 3 | AV in | | |
| | | INPUT 5 | HDMI in with HDCP | | |
| | | USB | Photo/Music mode, Software update | | |
| OSD language | | | English/French/Spanish | | |
| Power Requirement | | | AC 120 V, 60 Hz | | |
| Power Consumption | | | 160 W (0.5 W Standby with AC 120 V) | 200 W (0.5 W Standby with AC 120 V) | 250 W (0.5 W Standby with AC 120 V) |
| Weight | | TV + stand | 30.9 lbs./14.0 kg | 47.4 lbs./21.5 kg | 57.3 lbs./26.0 kg |
| | | TV only | 26.5 lbs./12.0 kg | 40.8 lbs./18.5 kg | 50.7 lbs./23.0 kg |
| Dimension² (W × H × D Inches) | | TV + stand | 37 ⁵/₁₆ × 26 ⁷/₁₆ × 12 ³/₄ | 43 ²/₁₆ × 29 ¹¹/₁₆ × 13 ¹¹/₁₆ | 48 ³/₄ × 32 ¹⁵/₁₆ × 13 ¹¹/₁₆ |
| | | TV only | 37 ⁵/₁₆ × 24 ³/₁₆ × 3 ⁴/₁₆ | 43 ²/₁₆ × 27 ¹/₁₆ × 3 ⁴/₁₆ | 48 ³/₄ × 30 ⁷/₈ × 3 ¹⁵/₁₆ |
| Operating temperature | | | +32°F to +104°F (0°C to +40°C) | | |

¹ Emergency alert messages via Cable are unreceivable.
² The dimensional drawings are shown on the inside back cover.
* As part of policy of continuous improvement, SHARP reserves the right to make design and specification changes for product improvement without prior notice. The performance specification figures indicated are nominal values of production units. There may be some deviations from these values in individual units.

### Optional Accessory

The listed optional accessory is available for the Liquid Crystal Television. Please purchase it at your nearest shop.
* Additional optional accessories may be available in the near future. When purchasing, please read the newest catalogue for compatibility and check the availability.

| Part name | Model number |
|---|---|
| Wall mount bracket | AN-37AG2 (for LC-40LE700UN) |
| Attachment | AN-37F00 (for LC-40LE700UN) |
| Wall mount bracket | AN-52AG4 (for LC-46LE700UN/LC-52LE700UN) |

EB - 55

18

45.     Sharp's Introduction of LED-lit LCD TVs did not result in the immediate end of CCFL-lit LCD TVs.  To the contrary, LED-lit LCD TVs initially did not sell well.  Priced higher than comparable CCFL-lit LCD TVs, consumers continued to purchase CCFL-lit LCD TVs (or Plasma TVs) notwithstanding the alleged benefits of the LED backlighting that Sharp and other manufacturers trumpeted.

46.     Manufacturers, including Sharp, continued to manufacture both CCFL and LED-lit LCD TVs, advertising and selling them side by side through the same retail and on-line channels.  While the LED lighting feature was often advertised, at least initially, no effort was made to conceal that these televisions utilized liquid crystal displays and were therefore in fact LCD TVs.  Most early advertising, like the Sharp materials quoted above, clearly stated that the televisions were LED-lit LCD TVs or otherwise accurately described and disclosed that the television being advertised utilized LCD display technology.  As noted, very few consumers were interested enough to purchase the product, notwithstanding the LED light source.

47.     After introduction of its LED-lit LCD TVs, Sharp made the marketing decision that gives rise to this lawsuit:  It began marketing the LED-lit LCD TVs as a new, advanced, technologically superior "type" of television, a so called LED TV, which was allegedly different from and better than LCD TVs, even though both "types" of television use the same liquid crystal displays to generate the same screen image.  The marketing materials below reflect this shift to false and misleading marketing and labeling:





# SHARP

## LC-70UD1U
### 70" CLASS (69.5" DIAGONAL) LED TV

**4K ULTRA HD LED TV**

**REVELATION 4K UPSCALER**
Upconverts all content into 4K
(3840 x 2160) resolution

**THX® 4K CERTIFIED**
Meets the highest standards
in picture performance

**4K ULTRA HD**
Four times the pixel resolution of HD

**70" CLASS (69.5" DIAGONAL)**

**SMART TV**
With dual-core processor
and built-in Wi-Fi

**SLEEK DESIGN**

**35W DUOBASS AUDIO SYSTEM**

**4 HDMI WITH NATIVE 4K INPUTS**

**ACTIVE 3D**
Two pairs of 3D glasses included in box

## AQUOS

Legendary AQUOS® picture quality is now available in 4K (3840x2160) resolution.
Introducing the 70" Class (69.5" Diagonal) AQUOS® 4K Ultra HD LED TV.
With four times the pixel resolution of HD and Sharp's proprietary Revelation
4K Upscaler, it makes everything you watch better. The picture quality experts
at THX® agree: the image quality is so outstanding that it earned the first THX
4K Certification. One look and you'll understand why the AQUOS® 4K Ultra HD
LED TV isn't just a 4K TV; it's certified amazing.

### *Revelation 4K Upscaler*

First, a dual-core processor fine-tunes
the original signal for optimal picture
quality. Next, Sharp's proprietary
Revelation 4K Upscaler instantly
analyzes and intelligently enhances the
content to create a 4K (3840 × 2160)
image. Movies, TV shows and video
games are sharper and more vivid.

### THX 4K DISPLAY

In earning the first THX 4K certification,
the AQUOS® 4K Ultra HD LED TV passed
over 400 rigorous tests, meeting the
highest standards in picture performance.

### *Four Times the Pixel Resolution*

Now with four times the pixel resolution of
standard HD, everything you watch on the
AQUOS® 4K Ultra HD LED TV is sharper,
more realistic, more stunning.

V–01 06/19/2013







48.     Sharp's cartons now referred to the television as "LED TVs," "LED HDTVs", "LED Smart TVs" or as having an "LED HD Picture."  Nowhere on the carton did Sharp say the televisions were "LCD TVs" that used an LED light source or anything similar.  Images of such cartons appear below:







49.     As a result of this deception Sharp was able to increase sales of its LCD TVs.

50.     LED-lit LCD TVs are **not** in fact LED TVs.  Although Sharp has falsely advertised LED-lit LCD TVs as "LED TVs" in a successful effort to increase sales and profits, the fundamental display technology of its flat screen televisions has not changed.  All of these televisions use LCD screens to display their pictures.  These televisions were LCD TVs before Sharp's false advertising and remain LCD TVs today.  While a few manufacturers have refrained from falsely advertising their televisions as LED TVs, the majority of manufacturers, including Sharp, have chosen falsely to advertise their LED-lit LCD TVs as "LED TVs" (or have used similarly deceptive language – *e.g.*, LED HDTV).

51.     The manufacturers that have refrained from this deception, including Sony, RCA, and Hitachi, have seen their market shares fall, while those manufacturers that have engaged in the deception, including Sharp, have reaped the benefits of increased sales.

52.     Sharp has used multiple marketing channels to create the appearance of a product category and price point that simply does not exist in the consumer market.  For example, for years, when visiting Sharp's website, customers were directed to choose between LED TVs and LCD TVs, with the televisions labeled as LED priced higher than those labeled LCD. Screenshots of Sharp's website shown below illustrate these points:









## MODEL OVERVIEW

The LC-32LE440U is part of our AQUOS® LED TV line. This 32" Class (31-1/2" diagonal) edge lit LED TV provides a natural, vibrant picture.
Browse the Under 60" Class »

The LCD category accurately describes the applicable display technology, while the LED category misleadingly identifies only the light source, thus falsely implying that LED, not LCD, is the display technology.  Moreover, when potential purchasers clicked through to the actual televisions, for the LED TVs there is no reference to such televisions being LCD display televisions.  This was deceptive.

53.     Sharp has used circulars, newspaper and magazine advertisements, and point of sale display materials to further its deception.

54.     In the absence of Sharp's deceptive advertising, Plaintiffs and other consumers would instead have purchased a comparable model CCFL LCD TV from Sharp or another manufacturer at a lower price, or would have paid less for the falsely marketed and advertised "LED TV" models that they purchased from Sharp.

55.     Sharp is fully aware that the televisions at issue are LED-lit LCD TVs, that they do not contain LED displays, and that they are not LED TVs.  Sharp has falsely advertised the televisions to increase sales and profits.  Sharp would not have been able to charge the premium it has charged for its "LED TVs" if it had accurately advertised the televisions as LCD TVs or LED-lit LCD TVs.  Indeed, upon information and belief, Sharp continued to advertise its televisions as LCD TVs in 2010 and 2011, only switching to describing its televisions as "LED TVs" in 2012 as its sales continued to suffer.

**LED-LIT LCD TVS ARE NOT LED TVS**

56.     LED-lit LCD TVs are not LED TVs, which employ a fundamentally different technology that is still several years away from availability at prices accessible to mainstream purchasers.  Actual LED TVs use light emitting diode displays instead of the liquid crystal displays or plasma displays described above.  The LED displays in these televisions are self-illuminating; they require **no** independent light source and do **not** contain liquid crystal technology.  Actual LED TVs are currently available for sale, but at prices that only the wealthy can afford; the televisions are far out of the reach of mainstream consumers.

57.     Sharp does not appear to market a true LED TV, but other manufacturers do.  For example, Samsung's 55" true LED TV, model KN55S9C, has retailed for $8,999.  A 60" Sharp LED-lit LCD TV sells for as low as $778 – less than one-tenth the price.

58.     As shown, while LED-lit LCD TVs are not LED TVs, various manufacturers, including Sharp, have deliberately and falsely claimed that such televisions are LED TVs in order to generate sales and charge a price premium for such televisions.

59.     Commentators have noted the deceptive nature of this marketing and labeling. For example (all emphasis added):

- "**They are not LED TVs.** Calling them such makes as much sense as calling its existing line of LCD televisions Cold Cathode Fluorescent Lamp TVs, or CCFL TVs, after the lighting technology that they use….[The] decision to drop 'LCD' was a smart marketing move….But it's also confusing consumers."

- "**There is no such thing as an LED TV.** The misleading marketing on this one really annoys me.  All 'LED TVs' are just LCD TVs that use LEDs as their light source."

- "There has been a **lot of hype and confusion** surrounding the introduction of 'LED' Televisions….LED TVs are still LCD TVs.  It is just that these new sets use LED backlights rather than the fluorescent-type backlights used in most other LCD TVs.  In other words, LED TVs should actually be labeled LCD/LED or LED/LCD TVs."

**LED-lit LCD TVs Are Not Inherently Superior to CCFL-lit LCD TVs**

60.     There is nothing about LED-lit LCD TVs that renders them inherently superior (or inferior) to CCFL-lit LCD TVs.  The image that is generated on the television screen is a function of multiple design elements working together, including the quality and specifications

(e.g., lumens output; transmissivity) of the LCD polarizers and color filters, light bulb, glass screen, circuitry, etc.  The result is a plethora of output specifications (e.g., contrast, refresh rate, color space), which can vary by make and model, but which are not dictated by the mere fact that one television is lit by a CCFL array while the other is lit by LEDs.  CCFL-lit LCD TVs can perform similarly and better than LED-lit TVs, generating equal or greater luminance, equal or better contrast ratio, and equal or better color space coordinates, among other output specifications.

## PRICE PREMIUM

61.    Sharp's deceptive marketing practices have allowed it to charge a premium for the LED-lit LCD TVs that it has misrepresented as LED TVs.  While the exact price premium varies by TV size (and other features), and has varied over time, at all times Sharp's LED-lit LCD TVs have been priced higher than otherwise comparable CCFL-lit LCD TVs.

## PLAINTIFFS AND THE PROPOSED CLASSES WERE DECEIVED AND INJURED

62.    Plaintiffs and other purchasers of these "LED TVs" were misled into believing that they were purchasing an LED TV, not the LCD TV they actually received, and have suffered damage as a result, in the form of the premium they were deceived into paying.  Plaintiffs and the proposed class members had no knowledge that the televisions were in fact LCD TVs, and did not suspect, nor did they have reason to suspect, that the televisions they were purchasing had been falsely and deceptively advertised.

## PLAINTIFFS' RELIANCE AND INJURY

63.    Plaintiffs relied upon Sharp's false and deceptive representations that the televisions they were purchasing were LED TVs – which was prominently displayed on each television carton at the time of purchase.  Plaintiffs believed that they were purchasing an LED TV, not the LCD TV that they actually received.  Plaintiffs would not have purchased or would

have paid less for their televisions had the televisions not been falsely and deceptively advertised or had they known the truth.

## CLASS ALLEGATIONS

64.     This action has been brought, and may be properly maintained, under Federal Rules of Civil Procedure 23(a) (1)-(4) and 23 (b) (2) and (3).

65.     Plaintiffs bring this action on behalf of themselves and all other members of a class (the "Nationwide Class") defined as follows:

> All persons who purchased, for personal use and not re-sale, within the United States within the four years (or other applicable statute of limitations period) preceding the filing of this Complaint up through any trial of this matter, a Sharp-brand LED-lit LCD television that is sold in a box that describes the television as an LED TV or LED HDTV or LED television.

> Excluded from the Nationwide Class are Sharp, and any person or entity related to or affiliated with Sharp, and any business, person, or entity that purchased such televisions for re-sale (*e.g.*, retailers), any judicial officer assigned to the case, the court staff and jurors, along with their immediate families.

66.     Alternatively or in addition, Plaintiff Popejoy brings this action on behalf of himself and all other members of a California class (the "California Subclass") defined as follows:

> All persons who purchased, for personal use and not re-sale, within the State of California within the four years (or other applicable statute of limitations period) preceding the filing of this Complaint up through any trial of this matter, a Sharp-brand LED-lit LCD television that is sold in a box that describes the television as an LED TV or LED HDTV or LED television.

> Excluded from the California Subclass are Sharp, and any person or entity related to or affiliated with Sharp, and any business, person, or entity that purchased such televisions for re-sale (*e.g.*, retailers), any judicial officer assigned to the case, the court staff and jurors, along with their immediate families.

67.     Alternatively or in addition, Plaintiff Sawyer brings this action on behalf of himself and all other members of a North Carolina class (the "North Carolina Subclass") defined as follows:

> All persons who purchased, for personal use and not re-sale, within the State of North Carolina within the four years (or other applicable statute of limitations period) preceding the filing of this Complaint up through any trial of this matter, a Sharp-brand LED-lit LCD television that is sold in a box that describes the television as an LED TV or LED HDTV or LED television.
>
> Excluded from the North Carolina Subclass are Sharp, and any person or entity related to or affiliated with Sharp, and any business, person, or entity that purchased such televisions for re-sale (*e.g.*, retailers), any judicial officer assigned to the case, the court staff and jurors, along with their immediate families.

68.     Alternatively or in addition, Plaintiff Sullivan brings this action on behalf of himself and all other members of a Massachusetts class (the "Massachusetts Subclass") defined as follows:

> All persons who purchased, for personal use and not re-sale, within the State of Massachusetts within the four years (or other applicable statute of limitations period) preceding the filing of this Complaint up through any trial of this matter, a Sharp-brand LED-lit LCD television that is sold in a box that describes the television as an LED TV or LED HDTV or LED television.
>
> Excluded from the Massachusetts Subclass are Sharp, and any person or entity related to or affiliated with Sharp, and any business, person, or entity that purchased such televisions for re-sale (*e.g.*, retailers), any judicial officer assigned to the case, the court staff and jurors, along with their immediate families.

69.     On information and belief, each model included in the proposed classes was sold by Sharp in a box that identified and marketed the enclosed television as an "LED TV" or "LED HDTV" or "LED television" (or substantially similar language).

70.     Each proposed class and subclass is composed of at least thousands of persons, and each is sufficiently numerous for class treatment.  Joinder of class members individually would be impracticable, and the resolution of each proposed class's claims in a single action will provide substantial benefits to the parties and the Court.

71.     Plaintiffs' claims are typical of the claims of each proposed class or subclass member that Plaintiffs (whether collectively or respectively) seek to represent, and Plaintiffs have no interests that are adverse to the interests of the members of each proposed class or subclass they or he, respectively, seeks to represent.

72.     This dispute raises fundamental questions of law and fact that are common to all of the proposed class or subclass members, and that predominate over any individual class or subclass member issues that must be resolved to adjudicate this claim, including, but not limited to:

(a)     Whether Sharp marketed and advertised LED-lit LCD TVs as LED TVs;

(b)     Whether Sharp intended to mislead the class when it marketed and advertised LED-lit LCD TVs as LED TVs; and

(c)     Whether it is false or misleading to describe an LED-lit LCD television as an LED TV.

73.     Plaintiffs will fairly and adequately protect the interests of the proposed class and subclasses that Plaintiffs (whether collectively or respectively) seek to represent.

74.     Plaintiffs have retained experienced, qualified counsel to represent the proposed classes and subclasses that Plaintiffs (whether collectively or respectively) seek to represent.

75.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all of the proposed class or subclass members is impracticable.  Even if Plaintiffs and the other proposed class or subclass members could afford individual litigation, the courts could not.  The amount at stake for each proposed class or subclass member is such that individual litigation would be inefficient and cost prohibitive. Additionally, the adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially conflicting adjudications of the claims asserted herein.  There will be no difficulty in the management of this action as a class action.

76.     This action is certifiable in the alternative under the provisions of Fed. R. Civ. P. 23(b)(2) because Defendant has acted or refused to act on grounds generally applicable to the

proposed class members, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to such members as a whole and necessitating that any such relief be extended to the proposed class members on a mandatory, class-wide basis.

**FIRST CAUSE OF ACTION**
**Violation Of New Jersey's Consumer Fraud Act, N.J.S.A. § 56:8-1 *Et Seq.*,**
**By Plaintiffs Popejoy, Sawyer, and Sullivan Individually And On Behalf Of The**
**Nationwide Class, Against Defendant Sharp**

77.     Plaintiffs incorporate by reference and re-allege each allegation set forth in paragraphs 1-76 hereinabove.

78.     Plaintiffs bring this claim on behalf of themselves and the Nationwide Class.

79.     New Jersey's substantive laws may be constitutionally applied to the claims of Plaintiffs Popejoy, Sawyer, and Sullivan, and the Nationwide Class, under the Due Process Clause, 14th Amend., § 1, and the Full Faith and Credit Clause, art. IV., § 1, of the U.S. Constitution.  New Jersey has significant contact, or significant aggregation of contacts, to the claims asserted by Plaintiffs and all Nationwide Class members, thereby creating state interests that ensure that the choice of New Jersey law is not arbitrary or unfair.

80.     Sharp maintains its principal place of business in Mahwah, New Jersey.  Sharp also owns property and conducts substantial business in New Jersey.  Sharp's decision to reside in New Jersey and avail itself of New Jersey's laws renders the application of New Jersey law to the Nationwide Class's claims herein constitutionally permissible.

81.     The application of New Jersey's laws to the Nationwide Class is appropriate under a governmental interest test because New Jersey's interests would be most impaired if its law were not applied to adjudicate any given Nationwide Class member's case.  As the New Jersey Supreme Court explained, "[t]he Consumer Fraud Act [N.J.S.A. § 58:8-1, *et seq.*]… represents a legislative broadside against unsavory commercial practices."  *Real v. Radir Wheels, Inc.*, 198 N.J. 511, 514 (2009).  Accordingly, New Jersey intends for its Consumer Fraud Act ("CFA") "to be 'one of the strongest consumer protection laws in the nation.'"  *New Mea Constr. Corp. v. Harper*, 497 A.2d 534, 543 (N.J. Super. 1985).  The Supreme Court has also observed

32

that the CFA should be "liberally construed," *Real*, 198 N.J. at 520, and that the "history of the Act is one of constant expansion of consumer protection," *Gennari v. Weichert Co. Realtors*, 148 N.J. 582, 604 (1997).

82.     Importantly, the New Jersey Supreme Court has identified "three main purposes" of the CFA:  "to compensate the victim for his or her actual loss; to punish the wrongdoer through the award of treble damages; and, by way of the counsel fee provision, to attract competent counsel to counteract the community scourge of fraud by providing an incentive for an attorney to take a case involving a minor loss to the individual." *Real*, 198 N.J. at 520-21. For any given Nationwide Class member's claim, while application of consumer laws other than New Jersey's might similarly compensate a consumer for his or her loss, New Jersey's laws have other purposes – namely, regulation of conduct of New Jersey-based businesses – and those purposes would be uniquely frustrated if New Jersey law were not applied to regulate the conduct of Sharp, a New Jersey-based business.  Upon information and belief, Sharp's deceptive marketing and advertising campaign, and nationwide distribution of deceptively marketed so called "LED TVs," were created, approved, and coordinated out of its principal place of business in New Jersey.  Any attempt to limit application of New Jersey law only to New Jersey consumers would undermine New Jersey law's purpose of "counteract[ing] the community scourge of fraud" where New Jersey-based companies doing business nationwide are concerned. Accordingly, New Jersey's interest in having its CFA apply would be most impaired were it not applied to govern Sharp's conduct with respect to the Nationwide Class.

83.     In the alternative, New Jersey law can be applied to the claims of all Nationwide Class members to the extent that it does not materially differ from the law of the other States with respect to these claims on these facts.  Any variations can be managed through groupings of State law and/or subclasses.

84.     Plaintiffs Popejoy, Sawyer, and Sullivan and the other members of the Nationwide Class, and Sharp, are all "persons" within the meaning of the CFA.

85.     Plaintiffs Popejoy, Sawyer, and Sullivan and the other members of the Nationwide Class are "consumers" within the meaning of the CFA.

86.     At all relevant times material hereto, Sharp conducted trade and commerce in New Jersey and elsewhere within the meaning of the CFA.

87.     The CFA is, by its terms, a cumulative remedy, such that remedies under its provisions can be awarded in addition to those provided under separate statutory schemes.

88.     Without limitation, Sharp has engaged in deceptive practices related to the sale of televisions, including but not limited to marketing and selling the televisions as LED TVs when they were in fact LCD TVs.

89.     As described herein, Sharp consciously failed to disclose material facts to Plaintiffs Popejoy, Sawyer, and Sullivan and the other members of the Nationwide Class.

90.     Sharp's unconscionable conduct described herein included the omission and concealment of material facts concerning the televisions.

91.     Sharp intended that Plaintiffs Popejoy, Sawyer, Sullivan and the other members of the Nationwide Class rely on its deceptive practices and the acts of concealment and omissions described herein to, without limitation:  (a) induce customers to purchase Sharp's so called LED TVs in the mistaken belief that they are upgrading from their existing CCFL-lit LCD TVs; (b) to charge a premium for such televisions that Plaintiffs and other consumers would not have paid had the televisions been accurately labeled and described; and (c) to capture sales from other brand televisions that were accurately labeled as LED-lit LCD TVs.

92.     Had Sharp disclosed all material information regarding its so called LED TVs to Plaintiffs Popejoy, Sawyer, Sullivan and the other members of the Nationwide Class, they either: (a) would not have purchased the televisions; or (b) would not have paid the premium charged had the televisions been accurately labeled and described.

93.     The foregoing acts, misrepresentations, omissions, and unconscionable commercial practices caused Plaintiffs Popejoy, Sawyer, Sullivan and the other members of the

Nationwide Class to suffer ascertainable damages, and they are entitled to recover such damages, together with appropriate penalties, including treble damages, attorney's fees, and costs of suit.

## SECOND CAUSE OF ACTION
**Violation Of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *Et Seq.*, By Plaintiff Popejoy Individually And On Behalf Of The California Subclass, Against Defendant Sharp**

94.     Plaintiff Popejoy incorporates by reference and re-alleges each allegation set forth in paragraphs 1-76 hereinabove.

95.     Plaintiff Popejoy brings this claim on behalf of himself and the California Subclass.

96.     The acts and practices engaged in by Sharp, and described herein, constitute unfair, unlawful, and/or fraudulent business practices in that Sharp marketed the televisions as LED TVs when they were in fact LCD TVs:

(a)     Sharp's practices, as described herein, constitute false and deceptive conduct;

(b)     the justification for Sharp's conduct is outweighed by the gravity of the consequences to Plaintiff Popejoy and the California Subclass members;

(c)     Sharp's conduct is immoral, unethical, oppressive, unscrupulous or substantially injurious to Plaintiff Popejoy and the California Subclass members; and/or

(d)     Sharp's conduct constitutes fraudulent, untrue or misleading actions in that such conduct has a tendency to deceive a reasonable person, including Plaintiff Popejoy and the California Subclass members.

97.     Sharp's false and misleading advertising was disseminated to increase sales and to increase the amount of money that Sharp could charge for each television that was sold.

98.     Sharp knew or should have known that their advertisements were false and misleading.

99.     Plaintiff Popejoy and the California Subclass have suffered harm as a result of these violations because they were misled into believing that they were buying an LED TV, not an LCD TV, and paid a monetary premium for these televisions that they otherwise would not have paid had the televisions been described accurately.  Plaintiff Popejoy and the California Subclass have suffered injury in fact and have lost money or property as a result of Sharp's unfair competition, as alleged herein.

100.     By reason of Sharp's violation of Cal. Bus. & Prof. Code § 17200, *et seq.*, Plaintiff Popejoy and the California Subclass are entitled to recover restitution, injunctive relief, and such other relief as provided by law.

## THIRD CAUSE OF ACTION
### Violation Of California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500 *Et Seq.*, By Plaintiff Popejoy Individually And On Behalf Of The California Subclass, Against Defendant Sharp

101.     Plaintiff Popejoy incorporates by reference and re-alleges each allegation set forth in paragraphs 1-76 hereinabove.

102.     Plaintiff Popejoy brings this claim on behalf of himself and the California Subclass.

103.     Sharp falsely marketed the televisions as LED TVs when they were in fact LCD TVs.  Sharp did this to increase sales and to increase the amount of money that Sharp could charge for each television that was sold.

104.     Sharp was aware at all relevant times that its advertising claims were false and misleading.

105.     Plaintiff Popejoy and the California Subclass have suffered harm as a result of these violations because they were misled into believing that they were buying an LED TV, not an LCD TV, and paid a monetary premium for these televisions that they otherwise would not have paid had the televisions been described accurately.  Plaintiff Popejoy and the California

Subclass have suffered injury in fact and have lost money or property as a result of Sharp's false advertising, as alleged herein.

106.　By reason of Sharp's violation of Cal. Bus. & Prof. Code § 17500, *et seq.*, Plaintiff Popejoy and the California Subclass are entitled to recover restitution, injunctive relief, and such other relief as provided by law.

### FOURTH CAUSE OF ACTION
**Violation Of The California Consumers Legal Remedies Act, Cal. Civil Code §§ 1750 *Et Seq.*, By Plaintiff Popejoy Individually And On Behalf Of The California Subclass, Against Defendant Sharp**

107.　Plaintiff Popejoy incorporates by reference and re-alleges each allegation set forth in paragraphs 1-76 hereinabove.

108.　Plaintiff Popejoy brings this claim on behalf of himself and the California Subclass.

109.　In connection with the sale of goods to consumers, Sharp:

　　(a)　represented and represents "that goods…have characteristics…which they do not have" in violation of Cal. Civ. Code § 1770(a)(5);

　　(b)　represented and represents "that goods…are of a particular style or model" when they are actually of a different "style or model" in violation of Cal. Civ. Code § 1770(a)(7); and

　　(c)　advertised and advertises "goods…with intent not to sell them as advertised" in violation of Cal. Civ. Code § 1770(a)(9).

110.　Sharp violated these provisions by representing that televisions were LED TVs when they were in fact LCD TVs.  Plaintiff Popejoy and the California Subclass have suffered harm as a result of these violations because they were misled into believing that they were buying an LED TV, not an LCD TV, and paid a monetary premium for these televisions that they otherwise would not have paid had the televisions been described accurately.

111.　On or about June 3, 2014, a CLRA notice letter was served on Sharp advising Sharp that it has violated, and continues to violate, the Consumer Legal Remedies Act.  This

Notice complied in all respects with California Civil Code §1782(a).  Plaintiff sent Sharp this Notice by Certified U.S. Mail, return receipt requested to Sharp at Sharp's principal place of business.  Plaintiff Popejoy's Notice advised Sharp that it must correct, repair, replace, or otherwise rectify the conduct alleged herein to be in violation of the Consumer Legal Remedies Act, and that if it failed to respond to this demand and to take full remedial action (including by making full restitution) within thirty days of receipt of the Notice, Plaintiff Popejoy will request restitution, damages, actual damages, and punitive damages.  A true and correct copy of the Notice is attached hereto as Exhibit A.  Defendant declined to remedy this wrong or cease its deceptive and unlawful practices as alleged herein.

112.    Plaintiff Popejoy has filed the declaration of venue required by Cal. Civil Code § 1780(d).

113.    Plaintiff Popejoy and the California Subclass, by this cause of action, seek both injunctive relief and compensatory and punitive damages.

**FIFTH CAUSE OF ACTION**
**Violation Of North Carolina General Statutes §§ 75.1.1 And 75-16, By Plaintiff Sawyer Individually And On Behalf Of The North Carolina Subclass, Against Defendant Sharp**

114.    Plaintiff Sawyer incorporates by reference and re-alleges each allegation set forth in paragraphs 1-76 hereinabove.

115.    Plaintiff Sawyer brings this claim on behalf of himself and the North Carolina Subclass.

116.    N.C. Gen. Stat. § 75-1.1 makes unlawful "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce."

117.    The acts and practices engaged in by Sharp, and described herein, constitute unfair or deceptive acts or practices in violation of N.C. Gen. Stat. § 75-1.1 in that, without limitation, Sharp marketed the televisions as LED TVs when they were in fact LCD TVs. Specifically:

(a)    Sharp's acts and conduct, as described herein, were unfair and deceptive;

(b)     Sharp's conduct offends established public policy, is immoral, unethical, oppressive, unscrupulous or substantially injurious to Plaintiff Sawyer and the North Carolina Subclass members; and/or

(d)     Sharp's conduct constitutes fraudulent, untrue or misleading actions in that such conduct is likely to deceive reasonable persons, including Plaintiff Sawyer and the North Carolina Subclass members.

118.    Sharp's false and misleading advertising was disseminated to increase sales and to increase the amount of money that Sharp could charge for each television that was sold.

119.    Sharp's unfair and deceptive acts and conduct were undertaken in, or affected, commerce.

120.    Sharp knew or should have known that its advertisements were false and misleading.

121.    As a result of Sharp's deceptive and unfair acts and conduct, Plaintiff Sawyer and the North Carolina Subclass members were misled into believing that they were buying an LED TV, not an LCD TV, and paid a monetary premium for these televisions that they otherwise would not have paid had the televisions been described accurately.  Plaintiff Sawyer and the North Carolina Subclass have therefore suffered injury in fact and have lost money or property as a proximate result of Sharp's unfair and deceptive acts and conduct, and are entitled, pursuant to N.C. Gen. Stat. § 75-16, to recover treble damages as well as attorneys' fees and costs.

122.    Further, Plaintiff Sawyer and the North Carolina Subclass are entitled to injunctive relief prohibiting Sharp from falsely advertising its televisions, and requiring that it engage in a corrective advertising campaign and re-label or recall all falsely labeled televisions.

**SIXTH CAUSE OF ACTION**
**Violation Of Massachusetts General Laws ("M.G.L."), Chapter 93A §§ 2 And 9,**
**By Plaintiff Sullivan Individually And On Behalf Of The Massachusetts Subclass,**
**Against Defendant Sharp**

123.    Plaintiff Sullivan incorporates by reference and re-alleges each allegation set forth in paragraphs 1-76 hereinabove.

124.    Plaintiff Sullivan brings this claim on behalf of himself and the Massachusetts Subclass.

125.    M.G.L. c. 93A, § 2 provides that, "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." M.G.L. c. 93A, § 9 permits any consumer injured by a violation of M.G.L. c. 93A, § 2 to bring a civil action, including a class action, for damages and injunctive relief.

126.    On information and belief, Sharp engaged in unfair and deceptive business acts and/or practices in violation of, without limitation, M.G.L. c. 93A, §§ 2 and 9.

127.    Sharp's unfair and deceptive scheme to mislead consumers was comprised of countless unfair and deceptive acts or practices, including, but not limited to, uniformly representing to Plaintiff Sullivan and other members of the Massachusetts Subclass, by means of its advertising, marketing and other promotional materials, and on its packaging and labeling, that televisions were LED TVs when they were in fact LCD TVs. Plaintiff Sullivan and the Massachusetts Subclass have suffered harm as a result of these violations because they were misled into believing that they were buying an LED TV, not an LCD TV, and paid a monetary premium for these televisions that they otherwise would not have paid had the televisions been described accurately.

128.    Sharp's acts and practices also violate 940 C.M.R. 3.05, M.G.L. c. 94, § 187, M.G.L. c. 106, § 2-313, and M.G.L. c. 106 § 2-314 and, as such, are unfair and deceptive in violation of M.G.L. c. 93A, § 2.

129.    Pursuant to M.G.L. c. 93A, § 9, Plaintiff Sullivan, on behalf of himself and members of the Massachusetts Subclass, seeks an order of this Court:

      a.      Enjoining Sharp from continuing to engage, use, or employ any unfair and/or deceptive business acts or practices related to its promoting, marketing, advertising, packaging and labeling of televisions in the manner set forth in detail above; and

      b.      Disgorging and restoring all monies that may have been acquired by Sharp as a result of such unfair and/or deceptive acts or practices.

130.     Plaintiff Sullivan and members of the Massachusetts Subclass may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

131.     The unfair and deceptive acts and practices of Sharp, as described above, present a serious threat to Plaintiff Sullivan and members of the Massachusetts Subclass.

132.     On or about May 8, 2014, Plaintiff Sullivan sent a demand for relief, in writing, to Sharp at least thirty (30) days prior to filing this complaint, as required by M.G.L. c. 93A § 9 ("Demand").  A true and correct copy of the Demand is attached hereto as Exhibit B.  Defendant declined to remedy this wrong or cease its deceptive and unlawful practices as alleged herein.

133.     Based on the foregoing, Plaintiff Sullivan and the other members of the Massachusetts Subclass are entitled to all remedies available pursuant to M.G.L. c. 93A including, but not limited to, refunds, actual damages, or statutory damages in the amount of twenty-five dollars per violation, whichever is greater, double or treble damages, attorneys' fees and other reasonable costs.

134.     Pursuant to M. G. L. c. 231, § 6B, Plaintiff Sullivan and other members of the Massachusetts Subclass are further entitled to prejudgment interest as a direct and proximate result of Sharp's wrongful conduct. The amount of damages suffered as a result is a sum certain and capable of calculation and Plaintiff Sullivan and the Massachusetts Subclass members are entitled to interest in an amount according to proof.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and each proposed class pray for judgment and relief as follows:

a.      An order certifying that this lawsuit is properly maintainable as a class action and certifying Plaintiffs as the representatives of the Nationwide Class, or alternatively or in addition, certifying Plaintiff Popejoy as the representative of the California Subclass, Plaintiff Sawyer as the representative of the North Carolina Subclass, and Plaintiff Sullivan as the representative of the Massachusetts Subclass;

b.      An injunction prohibiting Sharp from advertising nationwide (or, alternatively, within the States of California, North Carolina, and Massachusetts) LED-lit LCD TVs as LED TVs or LED HDTVs or LED televisions;

c.      An order requiring Sharp to engage in a corrective advertising campaign that informs the consuming public nationwide (or, alternatively, within the States of California, North Carolina and Massachusetts) that so-called LED TVs are in fact LCD TVs with an LED backlight.

d.      An order requiring Sharp to re-label (or recall) all new LED-lit LCD TVs in the possession of distributors or retailers or other resellers for resale nationwide (or, alternatively, in the States of California, North Carolina, and Massachusetts) that do not contain a clear and conspicuous disclosure that the television is an LCD TV with an LED backlight.

e.      For the Second and Third Causes of Action only, restitution in an amount to be determined at trial;

f.      For all Causes of Action other than the Second and Third Causes of Action, an award of compensatory, statutory, treble and punitive damages in amounts to be determined by the Court and/or jury;

g.      For prejudgment interest as allowed by law;

h.      For attorneys' fees and costs; and

i.      For such other and further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury of all issues properly triable thereby.

RESPECTFULLY SUBMITTED,

DATED: October 17, 2014            By: /s/ Scott Alan George
                                        Scott Alan George
                                        Jonathan Shub *(Pro Hac Vice Appl. To Be Filed)*
                                        Seeger Weiss LLP
                                        550 Broad Street; Suite 920
                                        Newark, NJ 07102
                                        973-639-9100 tel
                                        973-639-9393 fax
                                        Email:     jshub@seegerweiss.com
                                                   sgeorge@seegerweiss.com

                                        Francis O. Scarpulla *(Pro Hac Vice Appl. To Be Filed)*
                                        Judith A. Zahid *(Pro Hac Vice Appl. To Be Filed)*
                                        Patrick B. Clayton*(Pro Hac Vice Appl. To Be Filed)*
                                        Zelle Hofmann Voelbel & Mason LLP
                                        44 Montgomery Street, Suite 3400
                                        San Francisco, CA  94104
                                        Telephone:     415-693-0700
                                        Facsimile:     415-693-0770
                                        Email:         fscarpulla@zelle.com
                                                       jzahid@zelle.com
                                                       pclayton@zelle.com

                                        Hayward J. Kaiser *(Pro Hac Vice Appl. To Be Filed)*
                                        Mitchell Silberberg & Knupp LLP
                                        11377 West Olympic Boulevard
                                        Los Angeles, CA 90064
                                        Telephone:     310-312-2000
                                        Facsimile:     310-312-3100
                                        Email:         hjk@msk.com

                                        Daniel R. Shulman *(Pro Hac Vice Appl. To Be Filed)*
                                        Gregory R. Merz *(Pro Hac Vice Appl. To Be Filed)*
                                        Kathryn J. Bergstrom *(Pro Hac Vice Appl. To Be Filed)*

43

Dean C. Eyler *(Pro Hac Vice Appl. To Be Filed)*
Gray Plant & Mooty
500 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Telephone:      612-632-3000
Facsimile:      612-632-4444
Email:          daniel.shulman@gpmlaw.com
                gregory.merz@gpmlaw.com
                katie.bergstrom@gpmlaw.com
                dean.eyler@gpmlaw.com

*Attorneys for Plaintiffs and the proposed classes*